Good morning. We have three cases set for oral argument today. Two of them have been consolidated for oral argument purposes. The first case that we're going to hear is 14-15-14 and 14-16-47, Ad Hoc Shrimp Trade Action Company v. United States. You may proceed. I understand you want to split your time 15 minutes and then five minutes for your rebuttal. That's correct, sir. So we've given all the parties a total of 20 minutes time due to the consolidation. Okay, you may proceed. Okay, thank you. Thank you. Very good morning. In these cases, Commerce has offered two separate arguments to justify its application of total adverse facts available to Hilltop in disregard of all information. Mr. Perl, I have a bunch of fact questions for you. I see that on page 7 of the first remand results for the fifth review, Commerce says that import data shows that between May 2004 and July 2005, Ocean Duke imported over 15 million pounds of shrimp from Cambodia, and that included significant quantities from Ocean King. But the official government production data from Cambodia indicates that they produced less than that discrepancy in those numbers. Well, Your Honor, to begin with, there is only a tenuous relationship, or could only be a tenuous relationship, with those figures and Ocean King, because as we've also noted in the briefs, it is undisputed that Ocean King itself, I think, was only established in May of 2005. Yes, the government then backs off that statement regarding that excessive quantity. It says, nonetheless, the amount remaining still is in excess. But within this case, it is difficult, perhaps, to come to an agreement, because what we are dealing with is a historical event. Commerce concluded that the record evidence perhaps suggested a transshipment issue between China and Cambodia. Correct, Your Honor. And the allegation that they raised was transshipment in POR1 and POR2. As the Court well knows, what we have before us today is an appeal regarding their determinations in POR4 and POR5. Now, it is undisputed on the record that during PORs 4 and POR5, there were absolutely no shipments of shrimp from Cambodia to the United States. If there are no shipments, it is self-evident that there could be no concerns of transshipment. Therefore, whatever concerns they may have had historically regarding Ocean King simply could not impact these two PORs, which are what is at issue in this appeal. And that is one of our primary concerns, is that the Department appears to be far more concerned with historical events as opposed to the actual information and data that is necessary to calculate an accurate dumping margin in both POR4 and POR5. Isn't the link though, isn't the link between those prior reviews and the reviews that we're looking at now, the affiliation between Hilltop and Ocean King through MR2? Well, yes, Your Honor. And again, what we're faced here with is information that was originally placed on the record in POR6, which then on remand, both POR4 and Well, are you defending the statements made by, is it Mr. Toew or Mr. Toew? Mr. Toew. Okay. Are you defending the statements made by Mr. Toew in which he says, no ownership interest, don't know anything about them? Your Honor, with respect to POR4 and POR5, we completely agree that there is an omission on the record with respect to the affiliation to Ocean King. So, the question Well, but it's not an omission. It's a direct factual misrepresentation. It is, it was, it was a, Your Honor, I believe that there is not sufficient information on the record to inclusively state that this was intentional. It was a question regarding affiliation But when you file a response, you have to file a certification as to its accuracy.  So, when Mr. Toew filed the responses or when he filed the responses, there's a certification as to the accuracy. So, it's inaccurate. Well Or if there's any material omissions, then isn't that a direct misrepresentation? It is, it is, it is a direct misrepresentation of that issue with respect to the affiliation with Ocean King. Including the fact that he owned a portion. Yes, that he was a shareholder. Absolutely, that's correct. The issue, we believe And that's where the credibility comes unraveled. Well, Your Honor Your problem is that there is utter unraveling, right? Once the decision was, once there is a falsification as to assume material issue, then Commerce said, we don't believe anything else you said. That is the theory that Commerce would have you accept. What's wrong with that theory? The problem with that theory, Your Honor, is that the statute itself clearly discusses when there's missing information, an adverse inference may be applied to that information which is missing. And this court, in J. John Dunan, can affirm that that is in fact the point of the statute. But that's not missing information. It's an affirmative false misrepresentation. Correct, Your Honor, with respect to one discrete element of the record. Under the theory that Commerce proposes any time in which there is an omission, which they claim Are you familiar with the evidentiary doctrine going back to the medieval common law? Falsus in unis, falsus in omnia. If you lie about one thing, it can be presumed that you lie about everything. Your Honor, as a matter of reason, that certainly can be persuasive. What we are dealing with here, however, is an anti-dumping proceeding where Commerce is required to have record evidence that supports its findings. To say that it has found a misrepresentation or if they want to allege, say, the respondent was untruthful about this issue, a third country affiliate, and then to use this alone as leverage to say, notwithstanding the fact that piece of information has no impact on our dumping margin calculations within these reviews, we can disregard everything. For example, you make the argument that because this is a Hong Kong based entity, a different standard of review applies, a different interpretation. But couldn't those Hong Kong documents simply be a total forgery? Absolutely not, Your Honor. No, no. Could they be? Could they be? They could not be. They could not be. Your Honor, those are independent government documents issued by Hong Kong, by the government. The evidence that we have on the record, the hilltop is an exporter located in Hong Kong, is not merely an assertion by Mr. To or any other employee of the company. It is not some piece of information being generated from their computer records. It is stand-alone objective documents. Moreover, as we've shown, the record in this case also includes a copy of the POR1 verification report. During POR1, Commerce conducted an on-site verification at hilltop's offices in Hong Kong, in which in part, they reviewed these independent business documents, the business license and the business registration. All right, but I mean, so you could have a Hong Kong entity, no question about it, but does that mean, as a matter of law, it could never be controlled by the People's Republic? Yes, Your Honor. As a matter of fact? Your Honor, we... Excuse me. You have an entity, a corporation that's in Hong Kong, and you're telling me it's impossible for that organization to be controlled as a matter of fact by the Chinese, by PRE? What we're saying, Your Honor, is that at the time of these reviews, and to my understanding, as we speak today, Commerce has well-established an explicit policy in non-market economy dumping cases, is that if the exporter is located in a market economy location, which they treat Hong Kong as such, then it is exempt. In circumstances when we have no reason to doubt that you might, in fact, be controlled by PREs. Your Honor, I would urge the Court to review carefully the cases that we have cited and the Federal Register notices... That's the problem you face, right? I mean, the story unravels for you, and along the way, so does the law. Well, Your Honor... What's to prevent the Department of Commerce questioning whether maybe there's deception and there is an affiliation with the Chinese company? What is to prevent them from doing it, Your Honor, is the fact that it is their established policy, not ours, which says if you are located in Hong Kong, you are exempt from the separate rate test. The test really doesn't apply. There's a footnote, and the footnote says, unless you have done something that has caused us to lack any belief in what you say about anything. Your Honor, I... Books could be cooked. I mean, your previous de minimis margin could have been based on cooked books, right? Hypothetically, right? Right? Your Honor, that would be a finding, and any finding that Commerce makes... So when you say, I don't believe you, like, for example, if I lost credibility in you because of one thing you said here in the morning, I'm not going to believe anything you say. Well, Your Honor... Is that what happens when you've lost your credibility? But in doing so, what the Department is doing is it is now using its ability to apply an adverse inference as a punitive measure. Let me come at this from a slightly different perspective. As a result of questioning from my colleagues, I think you have agreed that Hilltop not only misstroke, but made a misleading statement about its affiliations. You say that Commerce attached too much penalty to that misstatement. What, in your view, is the correct amount of penalty? What should Commerce have done once Commerce felt that it had lost faith in you? Well, Your Honor, pursuant to the statute, since it's well settled that the purpose of the dumping law is to be remedial and not punitive... What should have happened? The question, Your Honor... Taking into account the fact that Commerce has no faith in your client's statements about its affiliations? Then the question, Your Honor, is what is the information that's missing? And what is the impact of that information on the dumping calculation that Commerce must make in PORs 4 and PORs 1? What happens if, as part of Commerce's belief that your client doesn't tell the truth, as they say, we no longer have any reason to believe the numbers you gave us that produced the de minimis rate? Number one, Your Honor, we would say that this is contrary to the plain intent of the statute, that if you're going to... The record shows... What would happen if Commerce had written down on a piece of paper, and in addition to our loss of faith in you, we no longer have any faith in the numbers you gave us? What would have been your response up here? Under the law, Your Honor, in order to reject that information, that's a finding. And any finding that Commerce makes... So they made that finding based on the fact that we've lost faith in your ability to tell us the truth. And consequently, we're checking out all the numbers that you gave us that produced the de minimis number. My response... What would be your legal argument? My legal argument, Your Honor, would be that there is no rational connection between a statement or a misstatement by an individual, Mr. Toe, with respect to his own affiliations or his other investments in third country companies. And that was the only misstatement he made? Your Honor, within POR4 and POR5, I'm not aware of what else it is that Commerce is alleging that would somehow undermine the reliability of all the information that it used in both POR and POR5. My recollection is that Mr. Toe signed an awful lot of things which turned out to be false, not just his ownership interest. Well, Your Honor, the government repeatedly states, yes, that he signed multiple certifications, but that does not mean that they are now alleging that there's other information within those submissions that it finds untruthful or that there's evidence demonstrating it is incorrect. The case that we cited by analogy was Butwell Pipefitting from Taiwan. In that case, Commerce issued multiple supplemental questionnaires to the respondents and at verification identified four previously unreported affiliates. And at the end of the day, what they did is they applied an adverse inference only to one of those four because they said this is the only company which is involved in any matter with the subject merchandise. Let me ask you another question. Hilltop had an opportunity to submit exculpatory information that could have rehabilitated Ocean King's misrepresentation, but it didn't do that. Why not? I'm sorry, Your Honor, what point are we discussing? We're discussing specifically Shrimp Trade Committee's brief in 1514 at page 53 where they say, while Hilltop had an opportunity to submit exculpatory information that could have rehabilitated the Ocean King misrepresentation, it failed to do so, and this is what bothers me, despite having sought and obtained an extension for the purpose of doing that. Your Honor, again, with respect to POR4 and POR5, we are acknowledging the fact that the record does not contain the information regarding the affiliation. In POR6, when Commerce issued a supplemental questionnaire to Hilltop asking about its affiliation, I believe this was the eighth supplemental, we submitted in response to that 90 pages worth of information answering all questions that the department had asked us with respect to Ocean King. This may be the government's assertion. It's unclear to me exactly what additional exculpatory arguments were used. I don't know. You're the one who asked for it. I beg your pardon? You asked for an extension of time to submit exculpatory evidence, and then you didn't submit anything. Your Honor, as you know in these cases, very often time may be limited, there may be other issues that you want to pursue, but at the end of the day, if you find nothing, there's certainly no purpose of making a submission. But I would again maintain that the critical questions are, what is the missing information and what is the impact of that information? You're into your rebuttal time, but I'm going to give you some additional time. But I do want you to take a minute and speak to the corroboration issue. Okay, thank you, Your Honor. The concerns that we have with both the AFA rate and the corroboration that Commerce is applying here is that they continue to use information that is five or six years earlier than the reviews at issue here, and is doing so in disregard of much more current information that would be far more probative of the current commercial reality. The SAA specifically states that one of the concerns that Congress had with the use of secondary information in these cases is that if the information is coming from an earlier time period, it may not be reliable with respect to the current review. That is clearly a grave concern that we have in this case. Commerce is continuing to use a 112% AFA rate that was obtained from the original petition in 2003 and their effort to corroborate that is to take a minute percentage of sales data from the original 2003 investigation. And in doing so, they are disregarding the fact that during P.O.R. What does that data represent in terms of volume, though? I mean, it's a significant amount of volume, correct? They claim it is a significant amount of volume in relation to other exporters. I can't speak directly to it because this is proprietary information. It is certainly a minute percentage of the data for that one respondent. But, Your Honor, I... I'll restore you back to your five minutes time, okay? I've got one more. You've got a question? Yeah, I've got one more. And that is, in footnote three on page eight of your brief in 1514, you discussed the sentencing report. Yes. And you say it was merely a series of unproven allegations advanced by the government in an attempt to seek a more punitive sentence against Mr. Lynn for the inaccurate labeling misdemeanor offenses. And I want to ask how you can say that, given the documentation from the investigation and particularly those emails back and forth between Mr. Lynn and Mr. Toew. Well, Your Honor, as has been discussed on the record, this was a five-year investigation. There was a wealth of information. What is now being focused upon is a handful of emails, not the entire record. And our point there was that that brief during the sentencing was not a conclusion of the court. In fact, it is notable that, notwithstanding the fact that the government, in conjunction with U.S. Customs, conducted this five-year criminal investigation, at the end, they declined to bring any transshipment charges against Mr. Lynn or Mr. Toew or any of the other individuals that were involved in this. Instead, what they attempted to do is having reached a deal whereby the only charge that was leveled against Mr. Toew was the mislabeling of fish. They attempted to use this information in an effort to persuade the judge to give Mr. Lynn a much stronger and harsher sentence. And in response to that, the judge himself was asking a very obvious question. If you felt that this was compelling evidence, given the record as a whole, why did you not bring these charges in the first place? And he found the entire effort, as he said, pretty thin. Can I ask you a question? Toward the end of both of your briefs, you refer to a topic that I want to explore a little bit. Both Commerce and the Corp of National Trade criticized your client for not having provided any additional information that could have been useful to support your case, which is that the 112 rate wasn't sufficiently corroborated. You contend that your client made a request to provide additional market data from other respondents. I'm reading from page 71 on your briefs. Tell us what that was. I mean, is there some data out here that is pertinent? This case was once remanded to Commerce to relook the corroboration issue, as you know. Yes. And it came back, and the best they had was Red Garden. You say there's some additional data out there. What is it? Well, absolutely, Your Honor. What is it? What is that data? In POR 4, one of the time periods, which is contemporaneous, one of the reviews under appeal here, there were two mandatory respondents. There was Hilltop and another company called Regal. Commerce calculated a full margin result for Regal. The identical methodology that they used in an effort to corroborate this 112% rate using this 2003 data, they could have used using the contemporaneous information in POR 4 to determine whether or not that 112% rate still remains commercially reasonable. Do we have a copy of your request? What you wrote there in your brief suggested to me that Hilltop gave a document, a request, to Commerce saying, here's what we want to supply. Is that in the record? I can't find your request. If we file a request, Your Honor, I would believe it is on the record somewhere. I mean, it seemed to me that this was probably your best argument, was in a case that had been remanded once to Commerce saying your attempt to corroborate is lousy. They come back with Hilltop. They just immediately, pardon me, come back with Red Garden, which goes back to an earlier time period. You said we got something in a fresher time period. But, Your Honor, that's a matter of public record. The POR 4 final results clearly show there was a second mandatory respondent. You're telling me that here today in oral argument. All I have is a document in your brief saying Hilltop made a request for this information. I believe, Your Honor, that we have raised the fact that not only did Commerce use outdated information in its effort to corroborate the 112% rate, but that in doing so, it declined to use far more current, if not contemporaneous data that it had available. Can you cite to the record? You don't have to do it right now. You can do it later or by letter. Cite to the record or give us a copy of the document that Judge Clevenger is talking about. I'm going to restore your five minutes' time, but I think that we've gone far enough. Okay. Okay? Okay. Thank you. Thank you. Mr. Kahn, I understand you're going to divide your time between five and 15 minutes, between both of you? That's right. I'm Mr. Kurland on behalf of the United States. Okay. I'm taking 15 minutes and Mr. Kahn on behalf of Ad Hoc Trump is taking five minutes. Good morning, Your Honors, and may it please the Court. I want to pick up on the issue on which opposing counsel left off, which is the corroboration issue. Put simply, all of the different corroboration arguments that plaintiff's counsel or appellant's counsel is making here are contradicted by this Court's recent decision in Dong Tai Pek, Honey, and to the extent there is anything left over by the slightly less recent but still fairly recent decision in KYD. In particular, the Dong Tai Pek decision involved, as in this case, a commerce relying on an AFA rate that stemmed from a review four years earlier in Dong Tai Pek. It was the sixth review applied in the tenth review that had been applied to the China-wide entity in the interim. In that case, actually, it was only applied to the China-wide entity in the first couple reviews after the sixth review, like the seventh and eighth, and again was being applied then in the tenth. Here, the rate has been applied to the China-wide entity in every review, in every segment of this proceeding, up to and including the fourth and fifth reviews that are at issue here, and this Court upheld that determination. It's really on all fours with the situation here and Hilltop's various arguments. To the extent Hilltop is arguing you can't use data that is from a previous review, that's not the case. Courts have routinely upheld commerce's use of that kind of data. The Dong Tai Pek decision is only the most recent example of that. To the extent Hilltop is arguing that you can't corroborate secondary information with secondary information, that's anathema. That happens all the time in trade proceedings, and it's certainly what happened in Dong Tai Pek. To the extent that Hilltop is arguing that... The law says that this AFA rate has to be a reasonably accurate estimate of the respondent's actual rate. Now, we know what the respondent's actual rate here is, right? No, we don't know what the respondent's actual rate here is. It was calculated. Well, Your Honor, it was calculated on data that commerce has determined was totally unreliable. Where in the record is there a determination by commerce that the data that produced the de minimis rate can't be reliable? Well, Your Honor, that commerce... Give me a site, a page site, a document that's signed by a commerce official that says what you just said. Sure, I can follow up with further specific sites. Like where? In the record in the fourth review remand determination, the particular section I'm thinking of, is it 4048 of the PUR4 record to 4058? What's it say? What commerce said is... I was unaware. I mean, I had a colloquy with your adversary here earlier about whether or not commerce could reject all that previous data on the grounds that it's unbelievable, but I never saw that they did it. I remember that colloquy, Your Honor, and... That's why I said what you said. Well, that's correct, because commerce did here... I'm not a department of commerce. Commerce did here determine... I think there are a couple nested determinations here. When we come back, let's assume, for purposes of argument, that the commerce never actually threw out the data that they had used to compose a de minimis rate, okay? Let's then go back to the Checchio as followed up, you know, in Gallup. This AFA rate has to be a reasonably accurate estimate of the actual rate in order to be lawful. So on the hypothetical that I'm giving you, which I think is actually the fact, you have an actual determined rate of de minimis, right? And what's the reason? How is the 112 a reasonably accurate estimate of that rate? Okay, Your Honor. I'm happy to work with the hypothetical, but my understanding of the facts is that commerce did determine... Can you answer the question? Sure. Even in Gallup and in the Checchio... Why is 112 a reasonably accurate estimate of zero? Because if you had... The rate isn't zero. Because you have an uncooperative respondent, and you're determining what the rate would be of the entire China-wide entity. All the parties here agree that the operative rate to be corroborated is not Hilltop's specific rate, but the rate of the China-wide entity as a whole. Here, commerce looked and said, you know, we recently conducted a Section 129 determination in which we looked at the largest single exporter by volume in this proceeding and determined that there were a good chunk of that exporter's sales that were at a rate of 112%. At what point in time? What's the red garden? What's the date for purposes of not being stale or being fresh? That was during the investigation. 2003? I'm sorry? 2003 data? It was 2003 data that was updated to reflect a difference in calculation methodologies between 2003 and 2013. But the actual data for the actual sales was 2003. The actual data was from 2003. Okay, let's assume for purposes of argument that there is data available that is fresher than 2003 that's pertinent. Okay? Can commerce ignore that data? Yes, it can. And, for example, that's something... Before you say, yes, it can, based on what authority? Well, KYD, for example, is an instance where... Let's put KYD on the other side of the table for the moment, okay? Okay. What authority does commerce have to say we refuse to look at... We've got this nice 2003 data, red garden data, but we refuse to look at any more current data? Well... End of letter, period, sign, assistant secretary. Right. What's the legal support for such a letter? Well, because at the end of the day, an AFA rate is supposed to be a rate... Don't tell me at the end of the day. Cite me a statute. Tell me what the legal authority is for commerce to ignore fresher pertinent data... Sure. ...being offered, especially in a circumstance when you've been criticized by the Department of... for not offering fresh data, and also you've been criticized by the CIT for not doing it. Sure. 1677 E sub B explicitly authorizes commerce to rely on the petition among potential sources for adverse facts available rates, and this court has interpreted... Let's assume you have a petition, a petition very old, and you can rely on that data, but you have fresher data that is pertinent. I'm just asking what authority gives commerce the power to say, take a walk. I don't care if you have more current relevant data. Well, the statute itself is ambiguous. It doesn't address this issue, so it's a matter of commerce's discretion whether it's reasonable, which is why I keep going to the legal authority. You weren't talking ambiguity earlier. Where is the statute ambiguous? Which section is ambiguous? Well, the statute doesn't address at all the question that Your Honor is raising, which is whether if there's additional data from, for example, cooperative respondents, whether commerce has to rely on that data, but there have been a number of decisions... Isn't more recent data more reflective of current market realities? Not necessarily, and that data would be related to cooperating respondents, who by definition are not similarly positioned, and this is what the trial court discussed at page 1293 of the opinion below. So you're arguing that commerce can just cherry-pick the data it wants? No, commerce can't cherry-pick in the sense that here it did not do so because it relied on a volume that was fairly significant, a six-figure volume of data. The problem is your opponent says that commerce did cherry-pick. They do, however, the trial court... How are you going to get out of that? What's your authority for using, let's say, more stale or older data when there's fresher data available from a more recent review? There is no statutory legal authority that requires commerce to use data simply because it was more recent, and there have been quite a number of decisions that have upheld commerce's reliance on data that is older but is reflective of higher rates that are consistent with what a non-cooperative, for example, China entity would use. This isn't the core of your argument, really, what you guys always say before the CIT apples and oranges, that is that the cooperative data is inherently different from the adverse data because one is dealing with a nationwide rate and the other is dealing with individuals who, as evidenced by their cooperation, probably have a lower rate coming. That's correct, and that's precisely what the trial court said at page 1293 of the opinion. I would add that this rate was applied to the China-wide entity in every review leading up to these reviews, including the immediately preceding reviews, and what commerce did here is it went back and did its homework. Obviously, the trial court, at least in the fifth review case, did remand it and say, The reason why I was pushing you is that all the notions of administrative law suggest, in fact state, that what commerce has to do is act reasonably, have to behave reasonably, and so in a circumstance like this where what you're trying to do is to compose an AFA rate for this person who's been deemed to be a theory entity, you just wonder why it is that commerce wouldn't willingly consider all information that is being offered. Doesn't commerce behave unreasonably if it just says, I'm sorry, we have red guards at the end of case. We don't care if you have anything else. Well, again, commerce has a long-standing practice of looking to the highest rates that have been calculated in the proceeding, and this course has upheld that practice. Let me say you had a high rate in 2003, and now this is 2006 or 2007 or 2008, right? Right. And then the highest rate is very much lower. Would it be reasonable to retreat to the 2003 rate? Well, particularly in this instance. Yes or no, would it be reasonable? If you had a data point that was relevant, say it was half. Yes, here, particularly when you have Hilltop. When you talk, Hilltop repeatedly says, well, there have been calculated rates in the interim, but a number of the calculated rates that Hilltop is talking about are rates that were calculated for Hilltop. Sometimes Hilltop is trying to talk about a third party. What they have is they say, you have red guard, right? Red guard is not a PR entity. Red guard is a very nice rate. It would just happen to be a great big high or a small amount. And I think what your adversary, Hilltop, is saying is, well, there's a red top head of Cousin. And his cousin had data, and according to them, the data is less than the red top data, and they say they're newer. So it should be considered. Well, I think with respect to counsel, he's making... Why should, on what theory can Commerce say, we just don't want to see that data? Well, I think counsel is making a different argument before your honors than he was making before Commerce. So I want to clarify that. At the time before Commerce, counsel's argument was, look, there are several companies in the investigation, and we want to go on a fishing expedition to see whether there's anything that's helpful to us in all of their data. So in addition to the red guard data, we want you to release the data of those other companies. What he's arguing now is that there was another mandatory respondent in just one of the two reviews that issue here. The fourth review, there was another mandatory respondent, and he's saying you should have used that company's rate. There's a number of reasons why that would be inappropriate, one of which, importantly, this argument was raised on reply, largely. But I'm familiar, because I continue to handle these China cases, that the company that he's talking about, we've learned in the seventh review, and we have arguments, I'm sorry, with Ad Hoc, actually, used different, for example, factors of production than... Is that in the record before us? Let's not argue on that. You're out of your time. You're well into the five minutes of your colleague. So let's hear from your colleague, and I'll give you your full five minutes. Thank you. Thank you, Your Honor. Good morning, Your Honors. I'm Jordan Kahn, with Picard-Kent and Rowe, representing the Appellee Ad Hoc Extreme Trade Action Committee. Judge Clevenger asked for law, and I turn to the precedent of this court, which recognized back 15 years ago, in Eflit de Checo, that commerce enjoys particularly great discretion in applying an AFA margin to an uncooperative respondent. And AFA is properly employed as a deterrent to non-cooperation. So we are in the apex... Nobody doubts any of that. The question is, on the corroboration issue, is there a reasonable relationship between their rate and 112, or was it sufficiently corroborated, because there might be some information out there that's pertinent that wasn't taken into account? There's absolutely no requirement for commerce to use the freshest, most pro-respondent data. You mean, as a matter of law, commerce can use the oldest and the most outdated information? Well, it is a qualified statutory... Isn't that hateful to say that the information isn't supposed to be outdated? The Court of International Trade said the mere passage of time does not prevent corroboration. And so here, commerce did a thorough analysis using data from the largest respondent in the investigation, and we submit that that's a... You're seriously arguing that commerce could take data that's 30 years old and ignore data that's fresh? Well, as my colleague... You're not saying that, are you? No, there has been... Then what are you saying? I am saying that, in this case, it was entirely reasonable to use from... to go from the fourth and fifth review periods back to the investigation. That's the same amount of time as this Court recently affirmed in Dong Tai, as my colleague made clear. But one of the important elements of the analysis is whether the margin is sufficient to deter non-cooperation. Here, Hilltop's conduct was egregious. So they're trying to micromanage the corroboration requirement. You have to use the freshest... the data of a cooperative respondent, Red Garden, even though they don't cooperate, and they're part of the enemy-wide entity. They don't dispute that. This is consistent with their theme throughout the litigation, trying to tell commerce how to do things. You have to honour our claimed independence from China. You have to accept that the Ocean King misrepresentation is immature. There's a purpose for corroboration, and that's to make sure that there's some sort of practical reality between the AFA rate and current market conditions, correct? That's absolutely correct. And as... So how can you argue, then, that if there's fresher data, say, two-year-old data, that commerce can go back 30 years or 15 years or six years and rely on that data and totally ignore the fresher data? It goes back to this being the enemy-wide entity. Would you agree that if there was fresher NME-wide adverse data on point, that it would be something that commerce should use in lieu of older NME adverse data? Commerce is the special master. I think it would be reasonable in that circumstance, but I would defer. Commerce gives a groundswell of discretion here to... It's reasonable in that circumstance, and that circumstance exists in this case. Why would it be unreasonable in this case? Excuse me, Judge Reina, but it does not exist in this circumstance. There's no fresher NME data. There's fresher cooperative respondent, and this respondent, HILTA, did not cooperate. At every turn, they thwarted legitimate agency inquiries. They concealed and denied the existence of their Cambodian affiliate throughout multiple reviews. We understand that part. We understand why AFA was selected, or there was a decision to resort to AFA to an adverse inference. Let's get back to the corroboration, and there's a reason for the corroboration. I don't believe that those two inquiries should be looked at in isolation, in a vacuum. I think they need to be looked at together. Gallant did impose a commercial reasonable requirement, but it should not be wielded by a malfeasant respondent to avoid consequence for their actions. To the extent that HILTA... But we have to apply the law, so we have to apply Gallant, regardless of what the parties say, and in Gallant, we set down that corroboration has to show that there's a reasonable link between the data that's used and current market reality. Isn't your short answer that it's unreasonable to use data from a cooperating respondent? It's microdata rather than macrodata. That's right, and what Judge Pogue at the CIT found was that since the enemy-wide entity had been... that that had been applied throughout the history of this order, that going back to the investigation was reasonable. We don't have to prove that Commerce did the only reasonable thing, just that... It hadn't been challenged until now, sir. But the fact that they're challenging... I mean, they're saying that to the extent that there's any consequence for their misconduct, it's capped at 9% because that was applied to the cooperative respondents. That can't be the standard. The corroboration requirement cannot benefit those who perpetuate material misrepresentation and thwart agency inquiry. Okay, you're out of time. Thank you, Your Honor. Thank you very much. Mr. Woodard, we store five minutes' time. We'll try to... Thank you. Thank you. As we were discussing earlier, I think it is very important to remember that the SAA explicitly talks about one of the concerns that Congress has is that use of earlier, outdated information may be unreliable because it's from a different time frame. And as this Court certainly recognizes, commercial reality is just simply not static. The fact that information... Is there a later non-market economy nationwide adverse review that is on point? Well, Your Honor, what the government seeks to impose upon us, this burden, is impossible to meet because by virtue of the fact... That was a yes or no question. There is the non-market economy. There is the China-wide rate. And by definition, the China-wide rate is never a calculated rate. It is simply the rate that they are assigning which is the most adverse rate from prior reviews. So they're saying we should throw out the market economy, the cooperating respondents rate, but then what are you left with if you're looking to get some view of what is the commercial reality in PR... You're seeking an updated nationwide rate is what you're seeking, right? Well, the department chooses an adverse rate. And if it is not from information that is contemporaneous, then the statute says they should then corroborate it. And the corroboration, what we're saying, has to be, if it's going to be reliable... They can corroborate it, among other things, from the petition. Is that not correct? That is a list of individual sources that the SAA states could be usable. However, that does not in any way satisfy the concern about using outdated information. If they... Did they, in fact, corroborate from the petition? They did not corroborate from the petition. What they corroborated from is using a minute percentage of sales data from a respondent in the original investigation. Let me say that real quickly. You're talking about the Red Garden data, right? Correct. Why is that unreasonable? Well, to begin with, Your Honor, as we've shown, Red Garden itself received an overall margin of de minimis, or zero. And so, what they've done, and it is, without question, sharing the data. Yeah, but they weren't looking to say, we're going to try to corroborate off of Red Garden's bottom line. They're looking at market conduct, right? They're looking at what was being charged for various products at various points in time. And at one point in time, Red Garden numbers were real high. Well, Your Honor, at one point in time... For a small percentage of their output, a whole lot of pounds was charged. Correct. The question we have is that if that information, the sales that they've selected, is not even representative of Red Garden's margin itself, because Red Garden received a de minimis. They're not trying to corroborate Red Garden's margin. But if they're trying to corroborate an even broader spectrum, they're trying to corroborate the 112% countrywide data. It's commercially reasonable. Well, but if Red Garden data shows that there's a number of instances... In 2003. There's a large amount of volume... Correct, Your Honor. ...of sales in the U.S. that have been above or at the 112. Why is that not reasonable corroboration? Well, it's unreasonable, Your Honor, because what they've done is they've taken outdated information and attempted to corroborate it using data that is equally outdated. So, at best, what they have accomplished... Let's say we find that it's not outdated information. Why would it be unreasonable? I don't... How could it not be outdated if commerce has clearly disregarded information... The question was a hypothetical. Well... If... It's still a question because... What's your answer to the presiding judge? I understand. This Court has noted that, yes, it may be reasonable under certain circumstances for commerce to use a small percentage of data in order to corroborate the rate as a whole, but it's on a sliding scale. And the CIT in particular has noted that the higher the AFA rate is, then it seems reasonable that you should have a larger amount of corroboration. So, again, I would say with that hypothetical, it remains unreasonable because what he's attempted to do is take a minute percentage of Red Garden's data that is not even reflective of Red Garden's reality and saying, this demonstrates that this 112 rate reflects commercial reality for the industry at large. So, notwithstanding the outdated concern, which we still feel is the largest, that we would believe that even then it would be a concern. In conclusion, Your Honor, we would urge this Court to consider, again, it is not... The issue here with AFA is not whether the ultimate rate itself is punitive. This Court has said repeatedly adverse inferences are not intended to be punitive. They can have a deterrent ability and that's understood. It can be punitive not just with the rate being applied. Could you conclude? Yes, Your Honor. A rate can be punitive not just with what the rate is being applied but with the amount of other information that commerce is disregarding. It can be punitive in the sense of what you are now treating as unavailable in applying adverse inference. Thank you.